UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICHARD WILLIAM CURRY, <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1] <br><br> Defendant. | No. 13 C 0630 <br><br> Magistrate Judge Mary M. Rowland |

# MEMORANDUM OPINION AND ORDER

Plaintiff Richard William Curry filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[2] A

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 25(d).

person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 et seq. The standard for determining SSI DIB is virtually identical to that used for Disability Insurance Benefits (DIB). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI on January 19, 2011, alleging that he became disabled on March 5, 2008, because of depression, hernia, and migraine headaches. (R. at 18, 177). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 18, 62, 63, 136). On June 12, 2012, Plaintiff, represented by a non-attorney representative, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 18, 34–60). The ALJ also heard testimony from Pamela J. Tucker, a vocational expert (VE). (*Id.* at 18, 34–60, 152–53).

The ALJ denied Plaintiff's request for benefits on October 1, 2012. (R. at 18–28). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since January 19, 2011, the application date. (*Id.* at 20). At step two, the ALJ found that Plaintiff's depression, chronic kidney disease, substance abuse, and left shoulder degenerate arthritis are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 21–22).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that he can

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

> lift/carry 50 pounds occasionally and 25 pounds frequently; sit 6 hours and stand/walk 6 hours in an 8-hour workday; no more than frequent lateral reaching on the left; no more than frequent overhead reaching on the left; simple, routine work such that he can understand, remember and carry out simple work instructions and tolerate no more than occasional changes in the work setting in terms of work processing and products; no more than simple workplace judgments; and no more than occasional interaction with co-workers, supervisors and the public.

(R. at 22). At step four, the ALJ determined that Plaintiff has no past relevant work. (*Id.* at 27). Based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including transportation cleaner, cleaner/industrial, and machine feeder. (*Id.* at 27–28). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.* at 28).

The Appeals Council denied Plaintiff's request for review on December 10, 2012. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in gen-

eral, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from

the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

On February 7, 2011, a psychiatric evaluation was performed at the Stroger Hospital Emergency Room. (R. at 327–30). Plaintiff reported using crack cocaine to treat depression symptoms. (*Id.* at 327). He reported hearing auditory hallucinations for months, last heard two days ago. (*Id.*). On examination, Plaintiff was depressed and anxious, with a blunted affect. (*Id.* at 328). No perceptual disturbances or paranoid delusions were present. (*Id.*). Dr. Williams diagnosed depression with psychotic features[4] and prescribed Zoloft 50mg, Risperdal 2mg, and hydroxyzine 25mg.[5] (*Id.* at 329–30).

On March 8, 2011, Ana A. Gil, M.D., conducted a psychiatric examination on behalf of the Commissioner. (R. at 294–98). Plaintiff reported a history of auditory hallucinations and paranoia. (*Id.* at 294). His frequent migraine headaches cause photophobia and nausea. (*Id.* at 295). On examination, Dr. Gil observed restlessness and a mild psychomotor agitation. (*Id.* at 296). Plaintiff's affect was sad, restricted,

---

[4] Major depression with psychotic features is a "mental disorder in which a person has depression along with loss of touch with reality." <www.nlm.nih.gov/medlineplus>

[5] Zoloft (sertraline) is used to treat depression, obsessive-compulsive disorder, panic disorder, anxiety disorders, and PTSD. Risperdal (risperidone) is a antipsychotic medicine used to treat schizophrenia and symptoms of bipolar disorder. Hydroxyzine is used as a sedative to treat anxiety and tension. <www.drugs.com>

but appropriate to content. (*Id.*). His mood was moderately depressed. (*Id.*). Plaintiff expressed paranoid ideation, but no hallucinations or delusions. (*Id.*). Dr. Gil diagnosed depressive disorder NOS, moderate in severity, and an antisocial personality disorder. (*Id.* at 298). She concluded that Plaintiff could not manage his own funds. (*Id.*).

On March 18, 2011, Plaintiff presented with chronic psychiatric problems and depression to the Stroger Hospital Emergency Room. (R. at 397). He reported feeling suicidal. (*Id.*). He was prescribed hydroxyzine 25mg, sertraline 50mg, and risperidone 2mg. (*Id.* at 402).

On June 29, 2011, Plaintiff presented at the Fantus Health Center's Department of Psychiatry for an initial psychiatric evaluation.[6] (R. at 427, 444–48). He reported continued depression with suicidal and homicidal ideation, but stated he would not act on these thoughts. (*Id.* at 444). Plaintiff reported continued auditory hallucinations, last heard that morning. (*Id.*). He admitted acting on the voices in the past. (*Id.*). Plaintiff's symptoms included depressed mood, sleep disturbances, poor appetite, feelings of hopelessness/helplessness/worthlessness, fatigue, anhedonia, lethargy, and social withdrawal. (*Id.*). He denied any manic symptoms but reported tactile hallucinations of "bugs crawling all over his body." (*Id.*). On examination, Gregory Davis, Ph.D., observed soft speech, depressed mood, flat affect, linear but illogical thought process, psychosis evident, suicidal and homicidal ideations, fair insight, and fair judgment. (*Id.* at 427). Dr. Davis assessed Plaintiff's suicide risk as moder-

---

[6] The Fantus Health Center is located at Stroger Hospital. (*See*, *e.g.*, R. at 444).

ate. (*Id.*). He diagnosed major depressive disorder with psychotic features, a history of crack cocaine, alcohol dependence in sustained full remission, and assigned a Global Assessment of Functioning (GAF) score of 19.[7] (*Id.* at 446). Dr. Davis opined that Plaintiff's hypertension, hernia, arthritis, hepatitis C, chronic kidney disease, financial stressors, homelessness, and unemployment all contributed to his poor mental health. (*Id.*). He discontinued Zoloft and Risperdal and started Plaintiff on Seroquel 20mg and Paxil 20mg.[8] (*Id.*).

On August 4, 2011, Charles Kenney, M.D., a nonexamining DDS physician, reviewed the record[9] and performed a disability evaluation. (R. at 75–86). Dr. Kenney opined that Plaintiff has mild restrictions in activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (*Id.* 79–80). He concluded that Plaintiff is moderately limited in the ability to carry out instructions, maintain attention and concentration for ex-

---

[7] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM-IV*). A GAF score of 11–20 indicates some danger of hurting self or others (e.g. suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g. smears feces) or gross impairment in communication (e.g. largely incoherent or mute). *Id.* at 34. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

[8] Seroquel (quetiapine) is an antipsychotic medication used to treat bipolar disorder and major depressive disorder. Paxil (paroxetine) is an antidepressant used to treat depression, obsessive-compulsive disorder, anxiety disorders, and PTSD. <www.drugs.com>

[9] The record, however, did not include the June 29, 2011 psychiatric evaluation from Fantus Health Center. (*See* R. at 77).

tended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 83).

On August 10, 2011, Plaintiff returned to the Fantus Health Center for an outpatient assessment. (R. at 440–43). He reported doing better with his new medications. (*Id.* at 440). Nevertheless, his suicidal ideations continued, although he stated he would not act on them. (*Id.* at 440–41). While the auditory hallucinations have decreased significantly, he still hears them 2–3 times a week. (*Id.* at 441). During the hallucinations, he feels paranoid and experiences "flashes." (*Id.*). On examination, Plaintiff was disheveled, his "hands have clubbing and . . . many cuts," and he appeared to be in pain. (*Id.* at 442). In sum, the Fantus assessment concluded that while his medications appear to be helping him, Plaintiff still exhibits psychotic symptoms. (*Id.*).

On January 3, 2012, Plaintiff presented to the Stroger Hospital outpatient psychiatric clinic for a follow-up examination. (R. at 435–39). Alessandra Tachauer, M.D., noted a history of major depressive disorder with psychotic features. (*Id.* at 437). Six months prior, Plaintiff's medication had been switched from Zoloft and Risperdal to Seroquel and Paroxetine in order to combat his signs of depression and auditory hallucinations. (*Id.* at 437). He has been doing a "lot better" with the new medications but continues to hear voices 2–3 times per week. (*Id.*). Plaintiff report-

ed occasional suicidal ideations, paranoia, and "flashes." (*Id.*). He acknowledged a history of alcohol, marijuana, and crack cocaine abuse. (*Id.*). While he continues to drink, it is much less than before, and it has been years since he used cocaine or marijuana. (*Id.*). On examination, Plaintiff was disheveled, hands have "clubbing" and "many cuts," and appears to be in pain. (*Id.* at 438). Dr. Tachauer opined that although his medications have helped, Plaintiff still exhibits some psychotic features. (*Id.*). She diagnosed major depressive disorder with psychotic features, a history of crack cocaine and alcohol abuse, and assigned a GAF score of 35.[10] (*Id.* at 436–37). Dr. Tachauer opined that Plaintiff's hypertension, chronic arthritis pain, hepatitis C, kidney disease, financial stressors, homelessness, and unemployment all contribute to his poor mental health. (*Id.* at 437).

## V. DISCUSSION

### A. ALJ Did Not Properly Evaluate the Treating Psychiatrists' Opinions

From February 2011 through January 2012, Plaintiff's treating psychiatrists at Stroger Hospital consistently diagnosed major depression with psychotic features and prescribed antipsychotic medications. (R. at 327–30, 397–402, 427, 435–48). During these visits, Plaintiff consistently complained of auditory and tactile hallucinations, paranoia, suicidal and homicidal ideations, and "flashes." (*Id.*). Plaintiff's psychiatrists observed flat affect, depressed mood, illogical thought process, evident

---

[10] A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *DSM-IV* at 34.

psychosis, and disheveled appearance. (*Id.*). His GAF was assessed at 19 and 35. (*Id.* at 436–37, 446).

The ALJ mentioned only Plaintiff's February 2011 visit to Stroger. (R. at 25). Instead, the ALJ's discussion of Plaintiff's mental impairments focused on Plaintiff's prison medical records, Dr. Gil's consultative examination, and Dr. Kenney's nonexamining evaluation. (*Id.* at 21–27). Based on these records, the ALJ concluded that Plaintiff's treatment for depression indicated "minimal findings." (*Id.* at 25).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). If the treating physician's opinion "is well supported and there is no contradictory evidence, there is no basis on which the administrative judge, who is not a physician, could refuse to accept it." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (citation

omitted). "Thus, to the extent a treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis for the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (citation omitted). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)) (other citation omitted).

Under the circumstances, the ALJ's decision to avoid giving any weight to Plaintiff's treating psychiatrists is legally insufficient and not supported by substantial evidence.[11] First, the ALJ erred by handpicking which evidence to evaluate while disregarding other critical evidence. *Scrogham v. Colvin*, 765 F.3d 685, 696–99 (7th Cir. 2014); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). The ALJ cannot discuss only those portions of the record that support his opinion. *See Myles*, 582 F.3d at 678 ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v.*

---

[11] The Commissioner contends that Dr. Tachauer is not a "treating source, because she saw Plaintiff only once." (Resp. 7). But Dr. Tachauer was a part of the group of psychiatrists and psychologists who treated Plaintiff at Fantus and Stroger from February 2011 through at least January 2012, and who presumably reviewed each other's records. (R. at 364–454). Thus, the Fantus physicians certainly had "an ongoing relationship" with Plaintiff. 20 C.F.R. §§ 404.1502, 416.902; *see also Meyers v. Colvin*, No. 13 C 4327, 2014 WL 1248067, at *2 (C.D. Cal. March 25, 2014) (finding a hospital to be a "treating source"). Even if Dr. Tachauer is not a treating source, the ALJ cannot ignore her psychiatric evaluation.

*Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). Instead, the ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *See Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994).

The ALJ erroneously concluded that Plaintiff's treatment notes "showed essentially normal mental status," which was being controlled by medications. (R. at 25). On the contrary, while Plaintiff's treating psychiatrists concluded that Plaintiff's medications were helping, his psychotic symptoms, including suicidal ideations, paranoia, auditory hallucinations, and "flashes" continued. (*Id.* at 437, 440–41). They opined that Plaintiff's hypertension, chronic arthritis pain, hepatitis C, kidney disease, financial stressors, homelessness, and unemployment were all contributing to his poor mental health. (*Id.* at 437, 446). And in June 2011, Plaintiff's treating psychiatrists switched his medications because Zoloft (sertraline) and Risperdal (risperidone) had proven ineffective at combatting his depression and auditory hallucinations. (*Id.* at 437, 446). Because psychotic depression tends to be episodic, the ALJ cannot extrapolate from days where Plaintiff seems to be doing better to conclude that he has improved his condition. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("But by cherry-picking [the treating psychiatrist's] file to locate a single treatment note that purportedly undermines her overall assessment of [the claimant's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness. As we have explained be-

fore, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.") (citations omitted); *Bauer*, 532 F.3d at 609 ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."); *see also* <http://en.wikipedia.org/wiki/Psychotic_depression> ("As with other depressive episodes, psychotic depression tends to be episodic, with symptoms lasting for a certain amount of time and then subsiding. While psychotic depression can be chronic (lasting more than 2 years), most depressive episodes last less than 24 months. Unlike psychotic disorders such as schizophrenia and schizoaffective disorder, patients with psychotic depression generally function well between episodes, both socially and professionally.").

The ALJ failed to mention any of Plaintiff's GAF scores from his treating psychiatrists, even though all of the scores were 35 or below. The GAF score of 19, for instance, indicates some danger of hurting others or self and gross impairment in communications. *DSM-IV* at 34. Even the GAF score of 34 suggests some impairment in reality testing and major impairment in work functioning. *Id.* While the American Psychiatric Association no longer uses this metric, *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014), at the time of Plaintiff's psychological evaluations, clinicians still used GAF scores to indicate a "clinician's judgment of the indi-

vidual's overall level of functioning." *DSM-IV* at 32. The GAF scores are not *dispositive* of Plaintiff's disability. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (explaining that the GAF score does not necessarily reflect doctor's opinion of functional capacity because the score measures severity of both symptoms *and* functional level). Nevertheless, Plaintiff's GAF scores are *evidence* suggesting a far lower level of functioning than the ALJ assigned. *Yurt v. Colvin*, 758 F.3d 850, 859–60 (7th Cir. 2014) (Although the ALJ was not required to give any weight to individual GAF scores, "the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to Yurt's claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC.").

The treating psychiatrists' opinions were not contradicted by the consulting physician. During the consultative examination, Plaintiff reported his history of auditory hallucinations and paranoia. (R. at 294, 296). He expressed feelings of worthlessness and anhedonia. (*Id.* at 295). Dr. Gil found Plaintiff to be paranoid, agitated, restless, sad, restricted, and depressed. (*Id.* at 294–96). Dr. Gil diagnosed depressive disorder NOS, moderate in severity, and antisocial personality disorder. (*Id.* at 298). She concluded that Plaintiff could not manage his own funds. (*Id.*).

The ALJ erroneously discounted Plaintiff's complaints of auditory hallucinations made to Dr. Gil, contending that they contradicted statements he made to his treating psychiatrist. (R. at 25). The ALJ misstated the record when she asserted that

Plaintiff "told Dr. Gil that he had been hearing voices for the past four months, despite having denied auditory hallucination for two days during the February 7, 2011 psychiatric evaluation." (*Id.*). On the contrary, Plaintiff's complaints of auditory hallucinations have remained consistent throughout the relevant time period. On February 7, he told his treating psychiatrist that he has been hearing voices for months and as recently as two days ago. (*Id.* at 327). A month later, he told Dr. Gil that although he was not hearing voices during his examination, for months he has heard them daily—usually at night. (*Id.* at 294, 296).

The ALJ found that Plaintiff's prison records minimize any mental health issues and do not support his claims of auditory hallucinations. (R. at 24–25). But Plaintiff's prison records predate his eligibility for benefits. (*Id.* at 20, 24). And the prison records do indicate that Plaintiff suffered from depression. (*Id.* at 239–93). That his prison records do not reflect any psychotic disturbances does not establish that Plaintiff's treating psychiatrists' opinions are flawed. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *20 (N.D. Ill. Mar. 21, 2012) ("Furthermore, that the prison records do not reflect any mental illness does not establish that [the claimant's treating psychiatrist's] opinion is flawed."). The release from prison could have exacerbated Plaintiff's existing mental health issues. *See* <http://en.wikipedia.org/wiki/Institutional_syndrome> ("[I]ndividuals in institutions may be deprived (whether unintentionally or not) of independence and of responsibility, to the point that once they return to 'outside life' they are often unable to manage many of its demands.").

Finally, the ALJ's reliance on the State agency consultants is contrary to law. The ALJ gave "great weight to the opinion evidence of the State agency consultants, which is consistent with the medical evidence of record and [Plaintiff's] relatively conservative treatment history." (R. at 26). But the opinion of a nonexamining physician is insufficient, by itself, to reject an examining physician's opinion. *Beardsley*, 758 F.3d at 839. And the State agency consultant issued his evaluation without having reviewed significant medical evidence. For example, neither the June 2011 nor the January 2012 psychiatric evaluations were in the file when Dr. Kenney performed his mental disability evaluation.

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded the treating psychiatrists' opinions. If the ALJ finds "good reasons" for not giving the opinion controlling weight, *see Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining what weight to give the opinions.

### B. Other Issues

Because the Court is remanding on the treating physician issue, the Court chooses not to address Plaintiff's other arguments. Nevertheless, on remand, after determining the appropriate weight to be afforded Plaintiff's treating psychiatrists' opinions, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

### VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [15] is **GRANTED**, and Defendant's Motion for Summary Judgment [26] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: February 17, 2015

*Mary M Rowland*

MARY M. ROWLAND
United States Magistrate Judge